IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BENJAMIN BURGESS, RHONDA BURGESS, HEIDI HOWARD, JOYCE MARTIN, BETH KARAMPELAS, TERRI DACY, and MICHAEL DACY, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) | CIVIL ACTION NO.  1:13-cv-02217 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| RELIGIOUS TECHNOLOGY CENTER, INC., ASSOCIATION FOR BETTER LIVING AND EDUCATION INTERNATIONAL, NARCONON INTERNATIONAL, and NARCONON OF GEORGIA, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT RELIGIOUS TECHNOLOGY CENTER, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION OR, ALTERNATIVELY, FOR FAILURE TO STATE A CLAIM

Plaintiffs' complaint stems from the Defendants' false, deceptive, or

misleading business practices, which Plaintiffs' counsel uncovered after filing a

case against Defendants Narconon of Georgia, Inc., and Narconon International for

the wrongful death of a former NNGA student.  That case led to three years of

litigation, extensive discovery, and a local news investigation, all spurred by the wrongful conduct of the Defendants.  As such, Plaintiffs' claims arise from years of research and investigation.

## INTRODUCTION

Plaintiffs' allegations against Defendant Religious Technology Center, Inc. ("RTC") arise from RTC's complete control over the Church of Scientology, including Scientology's "secular social betterment organizations," Defendants Association for Better Living and Education ("ABLE"), Narconon International ("International"), and Narconon of Georgia ("NNGA").  Although Defendant RTC has attempted to formally separate itself from the activities of the Church of Scientology and the other Defendants, a matter emphasized in its Motion to Dismiss, Defendant RTC does not act consistently with these formalities.  To the contrary, as set forth herein, Defendant RTC: holds out the Narconon rehabilitation program as its own, promotes the Narconon program to the public, and exercises control over the way in which individual Narconon centers operate.

Ultimately, Defendant RTC has sought to promote and expand the Narconon program as part of its goal to expand the reach of Scientology and "clear the planet" of non-Scientologists.  The facts, as alleged by Plaintiffs and further supported in this response to Defendant RTC's Motion to Dismiss, show that

Defendant's motion to dismiss for lack of personal jurisdiction should, therefore, be denied.  Alternatively, Plaintiffs requests that this Court grant jurisdictional discovery on the extent of Defendant RTC's contacts within the state of Georgia, as set forth in Part III, *infra*.

Plaintiffs, Benjamin Burgess, Rhonda Burgess, Heidi Howard, Joyce Martin, Beth Karampelas, Terri Dacy, and Michael Dacy, filed the instant action individually and on behalf of the class of others similarly situated, against Defendants RTC, ABLE, International, and NNGA, asserting claims sounding in fraud, contract, quasi-contract, and negligence, as well as Georgia's Racketeer Influence and Corrupt Organizations ("RICO") statute, O.C.G.A. § 16-14-1, *et seq.*

Plaintiffs and the proposed class members paid money to one or more of the Defendants to procure drug and rehabilitation services at NNGA, and to cover costs associated with books, housing, and related goods and services.  The Narconon program was established in 1966 as a drug rehabilitation program based on the writings of L. Ron Hubbard, a science-fiction writer and the founder of the Church of Scientology.  Narconon's treatment for drug and alcohol addicts is based exclusively on Hubbard's writings, also known as "technology" or "tech." Narconon's proponents believe that strict adherence to the Hubbard technology alone will completely address the rehabilitation needs of its patients.  Therefore,

patients receive no counseling or education in drug and alcohol rehabilitation, and the therapeutic discussion of drugs and their effects is actually discouraged.

Defendant International is the parent/licensor of Defendant NNGA, and it exercises direct control over the time, manner, and method of NNGA's operations. Defendant International, in turn, is controlled by Defendant ABLE, an umbrella group that oversees the drug and alcohol rehabilitation, education, and criminal-justice activities of the Church of Scientology.

Defendants ABLE, International, and NNGA are all controlled by Defendant RTC, which oversees Church of Scientology activities and serves as the final arbiter and enforcer of orthodoxy for all Scientology-related activities and organizations.  Defendant RTC's Chairman of the Board, David Miscavige, is the current leader of the Church of Scientology and its many affiliated organizations, having assumed that role shortly after Hubbard's death in 1986.  In fact, the Church of Scientology, through Miscavige's subordinate, Sue Wilhere, publicly declared to the *St. Pete Times* newspaper that "Mr. Miscavige is Scientology."

Under Miscavige's leadership, management, and control, the Defendants function as an interrelated and interdependent network of entities that aim to expand the reach of the Church of Scientology. Through its websites, marketing materials, advertising, and personnel, the Defendants have repeatedly made a vast

array of false and misleading claims and have employed other deceptive techniques in their dealings with drug and alcohol addicts and their families.  These misrepresentations pertain to, among other things: the effectiveness of the Narconon program, which consists of a "sauna and vitamin" program and written "training routines" originally devised to teach communication skills to Scientologists; Narconon's purported success rate; Narconon's connection to Scientology; the certifications of NNGA's staff; NNGA's housing and "drug-free" environment; and the nature of its government licensing.

Through these activities, Defendants acted in concert either as agents or principals of one another, partners, joint venturers, or co-conspirators.  By reason of their justified reliance on Defendants' false statements and material misrepresentations, Plaintiffs and all class members suffered actual physical, mental, and economic harm, and they seek restitution, compensatory damages, and punitive damages.

## ARGUMENT AND CITATION OF AUTHORITY

"In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a *prima facie* case of jurisdiction over the movant, non-resident defendant." *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988).  In evaluating whether

5

plaintiff carried this burden, the district court must construe the allegations in the complaint as true, to the extent they are uncontroverted by defendant's affidavits or deposition testimony.  *Id*.  In addition, where the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the non-movant plaintiff.  *Id.*

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.,* 593 F.3d 1249, 1257-58 (11th Cir. 2010) (quotation omitted).

## I.  RTC is Subject to Personal Jurisdiction through Georgia's Long Arm Statute

Georgia's Long Arm Statute provides as follows:

A court of this state may exercise personal jurisdiction over any nonresident or his or her executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he or she were a resident of this state, if in person or through an agent, he or she:

(1) Transacts any business within this state;

(2) Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act; [or]

6

> (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state. . . .

O.C.G.A. § 9-10-91.

### A. Defendant RTC's Control over ABLE, International, and NNGA

As set forth above, Georgia's Long Arm Statute provides for the exercise of personal jurisdiction over a nonresident defendant where one of the statute's subsections is satisfied by the acts or omissions of the non-resident defendant *or its agent*. *See* O.C.G.A. § 9-10-91.

Defendant RTC's arguments focus on whether it, in its official capacity as RTC, meets any of the Long-Arm statute's six subsections.  However, as Plaintiffs alleged in their Complaint, RTC, through its Chairman of the Board, David Miscavige, has subjected itself to personal jurisdiction in Georgia through its extensive control over its agents, ABLE, International, and NNGA, its repeated instances of taking the credit for and touting the benefits of the Narconon program and the individual Narconon centers, and its thorough involvement in the expansion of Narconon.  (*See* Compl. ¶¶ 20-22, 64, 69, 71-73).  While Defendant RTC may have kept itself formally separate from Defendants ABLE, International, and NNGA, Plaintiffs have alleged, and can show, that the reality is quite different.

### 1.  Narconon's Role within the Church of Scientology

Since its inception, Narconon has been viewed as an initial step towards conversion into the Church of Scientology, or "The Bridge to the Bridge."  (*See* Exh. A; *see also* Exhs. B, C).  Documents filed by the Church of Scientology with the Internal Revenue Service illustrate that ABLE and Narconon have long been Scientology-related entities.  (*See* Exh. D).

Narconon's perceived role in expanding the reach of Scientology is illustrated, for example, by the "Clear Expansion Committee" – an initiative to coordinate the expansion of all Scientology activities to "clear the planet." (Exh. E).  Narconon is described as a facet of that initiative, with the goal, or "ideal scene," being "ten to fifteen thousand active Scientologists moving on the Bridge and participating in activities that get LRH's tech disseminated and delivered in the local community."  (*Id.* at 7).  Narconon's role is described at length in a Scientology booklet devoted to the activities of the Clear Expansion Committee. (*Id.* at 18).

Narconon's role on the Clear Expansion Committee is confirmed by an internal executive directive.  (Exh. F).  ABLE employees, including Narconon Executive Directors ("EDs"), are included on the committee, and the directive promotes the opening of new Narconon centers.  (*Id.* at 2-3).  This executive

directive is authorized by AVC International[1] ("AVC"), a division of RTC that checks for compliance with Hubbard "tech."  The directive is also approved by the Watchdog Committee[2] ("WDC"), a group completely controlled by Defendant RTC, through Miscavige.  (*Id.* at 4).  In the directive, Scientology trademarks are used with RTC's permission.  (*Id.*).  Additional executive directives provide a checklist for the Clear Expansion Committee program, which provides as an "operating target" holding a meeting with Scientology and ABLE representatives, including Narconon EDs.  (Exh. G at 4-5; Exh. H).  These documents are also authorized by AVC and include RTC's licensing information.  (Exh. G at 9; Exh. H at 4).

Another internal document from the Church of Scientology regarding the Clear Expansion Committee is specifically directed to the ABLE organizations, including Narconon, and provides detailed instructions for "recovering Scientologists back onto the Bridge."  (Exh. I).  This document is authorized by AVC and includes RTC's licensing information.  (*Id.* at 5).  A Clear Expansion Committee Directory booklet from 2002 lists Field Service Members, Auditors, business associations, and ABLE representatives, including Narconon employees,

---

[1] Discussed in Part I-A-3, *infra*.
[2] Discussed in Part I-A-2, *infra*.

as its members.  (Exh. J at 9).  The trademark and copyright information of RTC, ABLE, and Church of Scientology International are all provided.  (*Id.* at 14).

Publications distributed to Scientologists also confirm the conclusion that Narconon is meant to expand the reach of Scientology.  For example, an issue of *International Scientology News* contains an article in which "Chairman of the Board RTC [Miscavige] announced the launch of a Golden Age of Organization." (Exh. K at 2).  In the article, the pattern of Scientology's expansion is illustrated with an image of Narconon centers spreading out of a Central Scientology Org. (*Id.* at 20).

## 2.  Command Channels within the Church of Scientology

A Church of Scientology document confirms that control of the individual Narconon centers begins at the highest level of "ecclesiastical authority" of the Church of Scientology International ("CSI"), called the Watchdog Committee ("WDC").   (Exh. L at 8-9).  There is an ABLE representative on the WDC, as depicted in this diagram from the Church document:



THE VARIOUS SECTORS OF SCIENTOLOGY

While RTC disavows any involvement in the management of WDC, the fact is that RTC, through its Chairman, Miscavige, is actively involved in WDC. In fact, Miscavige has, on at least one occasion, personally selected a Church of Scientology employee to serve as WDC ABLE. (Exh. M). Miscavie gives WDC his orders, either in person, or through written orders given to WDC members by RTC employees. (*Id.*). In addition to appointing and giving directions to WDC ABLE, Miscavige, in his role as Chairman of RTC, sends RTC employees to

monitor the work performance of WDC ABLE.  (*Id.*).  Miscavige's orders are then passed down from WDC ABLE, through International Management, down to the ABLE continental office, and to its social reform programs, including Narconon. (Exh. N).

      RTC's control over Church of Scientology affairs does not end with WDC, however.  At the direction of Miscavige, RTC employees give directions to other levels of CSI management.  (Exh. O).  As the true ecclesiastical authority in the Church of Scientology, Defendant RTC and its Chairman, Miscavige, bypass the official corporate structure to govern Scientology-related activities as they see fit. (*See id.*).

      In fact, one of RTC's own documents confirms its involvement in Narconon. RTC "Executive Directive No. 450," addressed to "All Scientologists," states, "The purpose of Religious Technology Center is to see that Scientology is kept pure and on-source and in this way to keep Scientology working."  (Exh. P at 1). The directive goes on to list the accomplishments of Scientology groups, include ABLE, with a portion dedicated to Narconon.  (*Id.* at 13-14).  The RTC directive states that Narconon's "drug rehab technology is statistically the most successful in the world," and notes that "[a]ll rehabilitation and training materials for Narconon

have been standardized[.]"  (*Id.* at 14).  The directive is signed "Captain David

Miscavige, Chairman of the Board, Religious Technology Center."  (*Id.* at 23).

### 3. RTC's Involvement in ABLE, International, and NNGA

In addition to command channels directing orders from Defendant RTC

down through Defendants ABLE, International, and ultimately to the individual

Narconon Centers, Defendants ABLE, International, and NNGA are also required

to send certain materials up to Defendant RTC for approval.  Specifically, certain

Narconon materials, called Completed Staff Work ("CSW"), require approval from

AVC[3] International, a division of RTC that inspects written materials for

compliance with Hubbard's writings.  (Exh. Q).   Only after the CSW was

approved by RTC could the materials be distributed or used by Narconon centers.

(*Id.*).

Similarly, Narconon centers report up to Defendant RTC regarding issues

with their facilities, students, and productivity.  For example, Defendant NNGA's

director, Mary Rieser, reported to the legal director of Defendant International, an

executive director of Defendant ABLE, and "OSA," when a NNGA student,

Patrick Desmond, died.  (Exh. R).  "OSA" refers to the Office of Special Affairs, a

department of the Church of Scientology responsible for directing legal affairs and

---

[3] AVC stands for Authorization, Verification, and Correction.

public relations, while pursuing investigations into matters of Church concern.  As with all Scientology-related entities, OSA answers to Defendant RTC and its Chairman, Miscavige.

### 4.  RTC's Promotion of Narconon

Despite Defendant RTC's supposed separation from the management of Church of Scientology, ABLE, and Narconon activities, Plaintiffs have uncovered numerous instances of RTC's Chairman, Miscavige, promoting Narconon centers' achievements and seeking to expand their reach.

For example, at a 2001 event for the International Association of Scientologists ("IAS"), Miscavige called Narconon the "world leader in the field of drug rehabilitation," and announced "our most major step to date, in creating an international headquarters for Narconon," at Narconon Arrowhead, in Oklahoma. MIscavige stated that Narconon's accomplishments were made possible by support of the IAS.  At an IAS patron ball in 2001, Miscavige stated that "with IAS freedom medal winner Gary Smith at the helm" Narconon was expanding, receiving more than 100 calls per day, and 10,000 visitors to their internet sites. Miscavige also announced that "the establishment of new stable points for social betterment, like Narconon Arrowhead . . . [was] paving the way for millions to walk onto the Bridge to OT."

In 2003, at another IAS event, Miscavige described Narconon Arrowhead as "the first IAS sponsored foothold to bring our tech everywhere," and as "the largest rehab facility on Earth.  More importantly, it is the engine to spread the program throughout the world."  At an IAS event in 2004, Miscavige stated that Scientology's international anti-drug crusade, achieved through Narconon, Criminon, and drug education lectures, had impacted more than 54 million people.

At a 2006 event celebrating the Maiden Voyage of the *Freewinds*, an important occasion in Scientology, Miscavige gave a speech, stating, in part:

> And for our final front in the war to bring human salvation to every zone of planet Earth misery, there's the global network of Narconons. It is already the largest residential network on Earth—and they aren't slowing down even a beat.  All, of course, emanates from our international training center at Narconon Arrowhead.  And rest assured their success is known far and wide, with some tens of thousands calling or emailing every month from New York to as far afield as Macedonia.
>
> Yet even more impressive, and directly in alignment with our initial strategy, is the generation of new Narconon centers to bring the tech everywhere. . . . It's fifty residential centers across 35 nations combined with 166 additional centers and groups, all fueled by our international training center at Arrowhead.  And as we celebrate tonight, Narconon has now spread their drug-free message to more than 10.4 million people planet-wide.

At another 2006 Maiden Voyage event, Miscavige mentioned that the public information displays at Scientology "Orgs" included "every program we sponsor," including Narconon.  At the opening of a Scientology Org in Madrid in 2004,

Miscavige stated, "We also sponsor Narconon, renowned as the most effective drug rehabilitation program on Earth."  At an opening of a Church of Scientology in San Francisco in 2003, Miscavige stated, "We are now opening new rehab centers, at the rate of one every eight weeks."

Relatedly, at a 2002 event celebrating Hubbard's birthday, Miscavige referenced the "strategic placement" of Narconon, emphasizing the importance of public service announcements.  Miscavige recounted how "CNN executives were so impressed, they put Narconon's message on the air, in prime-time rotation, for two full months."  Miscavige also summarized the accomplishments of existing and new Narconon centers, as well as the "Certified Chemical Dependency Counselors" of Narconon Arrowhead staff.  At a 2004 celebrating Hubbard's birthday, Miscavige stated that "we set out to dramatically escalate our impact on the world," through, *inter alia*, "massive new headquarters for Narconon," and that "we rescue people from drugs" as part of the "complete job of planetary salvage." At a 2006 event celebrating Hubbard's birthday, Miscavige described Hubbard "as a name synonymous with drug-free lives across all religious boundaries."

More recently, in 2013, as documented in the IAS magazine *IMPACT*, Miscavige referenced "a forthcoming fleet of Continental Narconons," stating: "We've already located all the buildings.  In fact, we already own several of them,

and those we don't own yet are due to be purchased in coming weeks." (Exh. S;

*see also* Exh. T).  RTC's website, www.rtc.org, accessed July 11, 2013, continues

to reference the accomplishments of Narconon, stating:

> It starts with the global view of the Association for Better Living and Education — ABLE — now with 445 groups across 59 nations utilizing LRH tech to heal populations devastated by a century of psychiatry, and so lift them to the point where they, too, can go free. . . . [P]eople can't go free if they are drugged out, or suffering what drugs bring to their neighborhoods. And that's LRH drug rehab tech in application under the Narconon banner. As of tonight, 1.2 million students have been turned away from drugs through Narconon drug education lectures. While in total across 27 nations, there are more than 65 Narconon centers.

> (Exh. U).

In fact, Defendant RTC, through Miscavige, directly disseminated some of

the fraudulent statements to which Plaintiffs object in their Complaint.  At an

August 2004 event at the Church of Scientology's Celebrity Centre, made into a

DVD called "This is Scientology," Miscavige stated, "While a 14-percent success

rate is considered norm, and a 20-percent success rate is considered huge in most

rehab programs, studies show Narconon achieves an almost 80-percent success

rate."

The above statements and documents are just a portion of Plaintiffs'

evidence solidifying the principal-agent relationship between Defendant RTC and

other named Defendants.  Additional evidence is attached hereto.  (*See* Exhs. V –

EE).  Based on the foregoing, Plaintiffs have met their burden of producing

evidence supporting the exercise of personal jurisdiction.

### B.  Applicable Provisions of Georgia's Long Arm Statute

Defendant RTC is subject to personal jurisdiction under multiple portions of

the Georgia Long Arm Statute.  First, under subsection (1) of the Long Arm

Statute, a nonresident Defendant is subject to personal jurisdiction in the state of

Georgia if, in person or through an agent, the defendant transacts any business

within the state.  O.C.G.A. § 9-10-91(1).  This subsection is to be construed

broadly and literally.  *Mitsubishi Motors Corp. v. Colemon*, 658 S.E.2d 843, 845

(Ga. Ct. App. 2008).  Jurisdiction under this subsection exists where: (1) the

nonresident defendant has purposefully done some act or consummated some

transaction in this state; (2) the cause of action arise from or is connected with the

act or transaction; and (3) the exercise of jurisdiction would not offend traditional

fairness and substantial justice.  *Sol Melia, SA v. Brown*, 688 S.E.2d 675, 679 (Ga.

Ct. App. 2009).

Contrary to Defendant RTC's argument, RTC has conducted business in the

state of Georgia—through its agents, ABLE, International, and NNGA.  In fact, as

confirmed by the President of International, Clark Carr, in his affidavit in support

of Defendant International's notice of removal, NNGA's reported revenue from

18

2007 to 2011 was in excess of $7,000,000.  Plaintiffs' claims are directly related to RTC's activities to the state, and the exercise of jurisdiction would comport with due process, as discussed in Part II, *infra*.  As such, the exercise of personal jurisdiction under O.C.G.A. § 9-10-91(1) is warranted.

Alternatively, under subsection (2) of the Long Arm Statute, a nonresident defendant is subject to personal jurisdiction in Georgia if it commits a tortious act or omission within the state.  O.C.G.A. § 9-10-91(2).  Defendant RTC committed numerous tortious acts through its agents, Defendants ABLE, International, and NNGA, as alleged in Plaintiffs' Complaint, including fraudulent misrepresentation, negligence *per se*, and violations of Georgia's RICO statute.  As such, the exercise of personal jurisdiction under O.C.G.A. § 9-10-91(2) is warranted.

As a third alternative, under subsection (3) of the Long Arm Statute, a Georgia court may exercise personal jurisdiction over a nonresident defendant who commits a tortious injury in Georgia, caused by an act or omission outside Georgia, provided that the tortfeasor "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state[.]"  O.C.G.A. § 9-10-91(3).  As alleged above, Defendant RTC's agent, NNGA, derived over $7,000,000 from its operation of the Narconon program in Georgia, illustrating that

RTC regularly does or solicits business in Georgia and derives substantial revenue from services rendered in this state.  Thus, even if the Defendants' tortious acts are interpreted as occurring outside of Georgia, RTC remains subject to jurisdiction.[4]

## II.  The Exercise of Personal Jurisdiction over RTC comports with Due Process Concerns

After determining that there is a basis for personal jurisdiction under Georgia's Long Arm Statute, the court must then consider whether the exercise of jurisdiction comports with the Due Process Clause of the United States Constitution.  *See Mahmud v. Oberman*, 508 F. Supp. 2d 1294, 1301 (N.D. Ga. 2007).   In *Burger King Corp. v. Rudzewicz*, the Supreme Court stated that due process dictates that a nonresident defendant may be subject to personal jurisdiction when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."  471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quotation omitted).

"Due process contemplates two types of jurisdiction over the person: general and specific jurisdiction."  *Paul, Hastings, Janofsky & Walker, LLP v. Tulsa*, 245 F. Supp. 2d 1248, 1253 (N.D. Ga. 2002).  A nonresident defendant's "contacts with the forum that are unrelated to the litigation must be substantial in order to

---

[4]  A tortious act occurs "either where the allegedly negligent act or omission was made ... or where the damage was sustained."  *Exceptional Marketing Group, Inc. v. Jones*, 749 F. Supp. 2d 1352, 1363 (N.D. Ga. 2010).

warrant the exercise of general personal jurisdiction." *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1274 (11th Cir. 2002) (also stating that "[t]he due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state" (quotation omitted)).

However, a nonresident defendant may be subject to specific jurisdiction in a state, even when it is not subject to general jurisdiction, when: "(1) it has purposefully established minimum contacts with the forum state; and (2) the exercise of jurisdiction will not offend traditional notions of fair play and substantial justice." *Paul, Hastings*, 245 F.Supp.2d at 1255 (citations omitted). To show minimum contacts, the plaintiff must meet three criteria. *Id.* First, the plaintiff's cause of action must arise out of, or relate to, the nonresident defendant's contacts with the forum state. *Id.* Second, the contacts must show that the nonresident defendant purposefully availed itself of the privilege of conducting activities within the forum state. *Id.* Third, the defendant's contacts must demonstrate that the nonresident could reasonably anticipate being haled into court in the forum. *Id.*

Defendant RTC has sufficient minimum contacts in Georgia to support the exercise of personal jurisdiction. First, the Plaintiffs' Complaint arises directly out

21

of Defendant RTC's contacts in Georgia—specifically, its involvement in the

Narconon program and its control over Defendants ABLE, International, and RTC.

Second, as illustrated by the foregoing evidence, Defendant RTC purposefully

availed itself of doing business in Georgia through its extensive promotion and

expansion of the Narconon program as a means to spread Scientology and "clear

the planet."  *See Burger King*, 471 U.S. at 475 (noting that the purposeful

availment requirement ensures that a defendant will not be subject to jurisdiction

solely as a result of "random, fortuitous, or attenuated contacts" or the "unilateral

activity of another party or a third person," but that jursidiction will be proper

when "the contacts proximately result from actions by the defendant *himself* that

create a substantial connection with the forum State" (quotations omitted)).  Third,

given its extensive control over Scientology-related activities and Narconon in

particular, Defendant RTC could reasonably anticipate being haled into court in

Georgia.

    As to traditional notions of fair play and substantial justice, these concerns

weigh heavily in favor of exercising personal jurisdiction over Defendant RTC.

*See id.* at 476-77 (providing that considerations relevant to this inquiry are "the

burden on the defendant, the forum state's interest in adjudicating the dispute, the

plaintiff's interest in obtaining convenient and effective relief, the interstate

judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social polices" (quotations omitted)).

As set forth in the notice of removal, Defendant NNGA brought in over $7,000,000 of revenue over five years in the State of Georgia. *See Vibratech v. Frost*, 661 S.E.2d 185, 189 (Ga. Ct. App. 2008) ("[I]t is not unfair to require a corporation to respond to a suit in a state from which it derives the benefits and privileges of conducting business." (quotation omitted)).  Defendants' documentation provided in support of removal of the instant action establishes that Defendant NNGA also enrolled 724 students in the Narconon program over the same time period.  Based on Plaintiffs' allegations in the Complaint, that means that at least 724 students, as well as their families and loved ones, fell victim to fraud, breach of contract, negligence, and civil racketeering, within the state of Georgia.  Finally, given the extent of Defendant RTC's control over the other named Defendants' activities, as a matter of fairness, it should have to answer in the state of Georgia for the acts of its agents.

Based on the foregoing, the exercise of personal jurisdiction over Defendant RTC would comport with the concerns of fair play and substantial justice.

## III.  Alternatively, Plaintiffs Seek Jurisdictional Discovery

Plaintiffs maintain that they have sufficiently alleged, and provided evidence in support of, exercising personal jurisdiction over Defendant RTC.  However, should this Court determine that the jurisdictional issue is unresolved by the parties' briefing and supporting evidence, Plaintiffs request the opportunity to conduct jurisdictional discovery as to the extent of Defendant RTC's contacts in Georgia.  A court has discretion to stay consideration of a motion to dismiss for lack of personal jurisdiction to allow the parties additional time to engage in discovery relevant to the jurisdictional issue where there is a basis for believing that discovery would be fruitful.  *See, e.g., Cable News Network, Inc. v. Video Monitoring Servs. of Am., Inc.*, 723 F. Supp. 765, 770 (N.D. Ga. 1989).

## IV.  Plaintiffs Stated a Claim as to all Ten Counts in the Complaint

Defendant RTC has argued in the alternative that Plaintiffs' complaint should be dismissed for failure to state a claim, for the reasons set forth in Defendant ABLE's and Defendant International's Motions to Dismiss.  (Def. Br. at 2).  As such, Plaintiffs hereby adopt their responses in opposition to those motions.

### III. CONCLUSION

For the foregoing reasons, Defendant RTC's Motion to Dismiss for lack of personal jurisdiction and, alternatively, for failure to state a claim, should be denied.  In the alternative, jurisdictional discovery should be permitted.

Respectfully submitted,

**HARRIS PENN LOWRY, LLP**

/s/ Jeffrey R. Harris

_____
JEFFREY R. HARRIS
(Jeff@hpllegal.com)
Georgia Bar No. 330315
JED D. MANTON
(Jed@hpllegal.com)
Georgia Bar No. 868587

1201 Peachtree Street, N.E.
400 Colony Square, Suite 900
Atlanta, GA  30361
Telephone: (404) 961-7650
Facsimile: (404) 961-7651

**FRANKLIN LAW, LLC**
REBECCA C. FRANKLIN
(Rebecca@franklinlawllc.com)
Georgia Bar No. 141350

1201 Peachtree Street, N.E.
400 Colony Square, Suite 900
Atlanta, GA  30361
Telephone: (404) 961-5333

***Attorneys for Plaintiff***

25

## <u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to the Local Rules of the Northern District of Georgia, the above-signed counsel certifies that the foregoing document complies with all formatting requirements of the Local Rules and further certifies that this document is printed in Times New Roman font, 14-point, pursuant to Local Rule 5.1(C).

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT**

**RELIGIOUS TECHNOLOGY CENTER, INC.'S MOTION TO DISMISS**

with the Clerk of Court using the CM/ECF system which will automatically send

e-mail notification of such filing to the following attorney of record:

| | |
|---|---|
| Cari K. Dawson, Esq.<br>Daniel F. Diffley, Esq.<br>David B. Carpenter, Esq.<br>Alston & Bird LLP<br>1201 W. Peachtree Street<br>Atlanta, GA 30309-3424<br><br>*Attorneys for Narconon International and Association for Better Living and Education International* | Matthew S. Coles, Esq.<br>Thomas M. Barton, Esq.<br>Coles Barton LLP<br>150 South Perry Street, Suite 100<br>Lawrenceville, GA 30046<br><br>*Attorneys for Narconon International and Association for Better Living and Education International* |
| Edward H. Lindsey, Jr., Esq.<br>James T. Hankins, Esq.<br>Goodman McGuffey Lindsey & Johnson, LLP<br>3340 Peachtree Road NE, Suite 2100<br>Atlanta, GA 30326-1084<br><br>*Attorneys for Narconon of Georgia, Inc.* | John K. Larkins, Jr., Esq.<br>William Taylor McNeil, Esq.<br>J.D. Dalbey, Esq.<br>Chilivis, Cochran, Larkins & Bever LLP<br>3127 Maple Drive NE<br>Atlanta, GA 30305<br><br>*Attorneys for Narconon of Georgia, Inc.* |
| John H. Fleming, Esq.<br>Valerie S. Sanders, Esq.<br>Stacey M. Mohr, Esq.<br>Sutherland Asbill & Brennan LLP<br>999 Peachtree Street NE, Suite 2300<br>Atlanta, GA 30309-3996<br>*Attorneys for Religious Technology Center, Inc.* | |

This 23rd day of July, 2013.

**HARRIS PENN LOWRY LLP**

/s/ Jeffrey R. Harris

_____

JEFFREY R. HARRIS
(Jeff@hpllegal.com)
Georgia Bar No. 330315
JED D. MANTON
(Jed@hpllegal.com)
Georgia Bar No. 868587

1201 Peachtree Street, NE
400 Colony Square, Suite 900
Atlanta, GA 30361
Telephone: (404) 961-7650
Facsimile: (404) 961-7651